**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**BRENDEN MOORE**

**Plaintiff,**

**v.** **Civil Action No. ___________**

**TRANS UNION, LLC,**
SERVE: Corporation Service Company,
Reg. Agent
1201 Hays Street
Tallahassee, FL 32301

**Defendant.**

**COMPLAINT**
**DEMAND FOR A JURY TRIAL**

COMES NOW the Plaintiff, Brenden Moore, by counsel, and for his Complaint against Defendant Trans Union, LLC ("Trans Union"), he states as follows:

## PRELIMINARY STATEMENT

1. This is an action for statutory, actual, and punitive damages, costs, and attorneys' fees brought to enforce Plaintiff's civil rights pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681x ("FCRA").

2. Trans Union is a consumer reporting agency ("CRA") and one of the largest and most influential CRAs in the United States of America.

3. The Fair Credit Reporting Act provides federally codified protection of Plaintiff's civil rights with regard to Plaintiff's privacy, Plaintiff's reputation, and Plaintiff's due process rights against defamation. The Fair Credit Reporting Act is part of a larger category of consumer protection statutes designed to arm consumers against discrimination, intrusions upon privacy, and other types of unfair and inequitable treatment. Similar statutes falling under this same umbrella of protection include, for example, the Equal Credit Opportunity Act, the Fair Housing Act, and the Fair Debt Collection Practices Act.

4. Claims under these federal protections are brought "in connection with any action involving a claim of 'unlawful discrimination,'" as described in 26 U.S.C § 62(a)(20). For the purposes of 26 U.S.C § 62(a)(20), the term "unlawful discrimination" is broadly defined in 26 U.S.C § 62(e) to mean "an act that is unlawful under . . .[a]ny provision of Federal, State, or local law, or common law claims permitted under Federal, State, or local law . . . providing for the enforcement of civil rights".

5. Not only do inaccurate consumer reports lead to discrimination against consumers, but they also make it more difficult for companies to efficiently extend offers of their services to qualified individuals. The most obvious example occurs when a consumer applies for credit, is subsequently denied due to inaccurate information on their report, and the lender loses what would have been

a potential customer. The inaccuracies not only harm the consumer, but they also deny the potential lender an opportunity to assess that consumer's creditworthiness accurately.

6. In Plaintiff's situation, not only was Plaintiff harmed by inaccurate and derogatory reporting, but housing providers were denied the opportunity to obtain accurate information about a potential tenant. Contrary to what Trans Union reported to Plaintiff's potential lessors, Plaintiff was not only qualified, but he was the type of tenant that most housing providers actively seek.

7. The FCRA demands that CRAs utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). CRAs must take actual steps to ensure the maximum possible accuracy of the information they report. It is not enough for them to simply parrot information they receive from other businesses.

8. Plaintiff brings claims under Section 1681e(b) against Trans Union because it reported inaccurate and derogatory information about Plaintiff, leading to Plaintiff being denied housing despite his ample qualifications.

9. The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017). This is particularly true as to how Trans Union has complied with its over 50-year-old obligations under the Fair Credit Reporting Act. Trans Union has been repeatedly sued by consumers, sanctioned by regulators,

and reprimanded by both District and Appellate courts to do more than an automated parroting of what their customer-creditors instruct. Had Trans Union followed that advice and heeded those warnings, Plaintiff would not have been harmed.

## JURISDICTION AND VENUE

10. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

11. Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred here.

## PARTIES

12. Plaintiff is a natural person who resides in Reunion, Four Corners, Florida and is a "consumer" as defined by 15 U.S.C. § 1681a(c).

13. Trans Union is a foreign limited liability company authorized to do business in the State of Florida through its registered agent in Tallahassee, Florida.

14. Trans Union is a "consumer reporting agency," as defined by 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

15. Trans Union disburses consumer reports to third parties under contract for monetary compensation.

## FACTUAL ALLEGATIONS

### *Section 1681e(b) of The Fair Credit Reporting Act Demands Maximum Possible Accuracy, Requires Substantive Investigations, and Prohibits Mere "Parroting"*

16. "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); . . . In enacting FCRA Congress adopted a variety of measures designed to ensure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

17. "The . . . FCRA . . . was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and reasonable manner." *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) (citations omitted). "'These consumer oriented objectives support a liberal construction of the FCRA,' and any interpretation of this remedial statute must reflect those objectives." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3d Cir. 2010) (quoting *Guimond*, 45 F.3d at 1333).

18. Over a decade ago, the Third Circuit apprised Trans Union of the high duty of care imposed by Section 1681e(b):

> [T]he distinction between "accuracy" and "maximum possible accuracy" is not nearly as subtle as may at first appear, it is in fact quite dramatic....
>
> There are, of course, inherent dangers in including any information in a credit report that a credit reporting agency cannot confirm is related to a particular consumer. Such information is nearly always "used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for ... credit." 15 U.S.C. § 1681a(d)(1). Allowing a credit agency to include misleading information as cavalierly as Trans Union did here negates the protections Congress was trying to afford consumers and lending institutions involved in credit transactions when it enacted the FCRA....
>
> Congress surely did not intentionally weave an exception into the fabric of the FCRA that would destroy its remedial scheme by allowing a credit reporting agency to escape responsibility for its carelessness whenever misleading information finds its way into a credit report through the agency of a third party....
>
> Trans Union remains responsible for the accuracy in its reports under the FCRA and it cannot escape that responsibility as easily as it suggests here. Congress clearly intended to ensure that credit reporting agencies exercise care when deciding to associate information with a given consumer, and the record clearly supports the jury's determination that Trans Union did not exercise sufficient care here.

*Cortez v. Trans Union, LLC,* 617 F.3d 688, 709-10 (3d Cir. 2010).

19. Section 1681e(b) sets forth a CRA's overall duty:

> (b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

20. Further, as Trans Union is aware, courts have held that even though the term "investigation" is not used in § 1681e(b), it is clear that Trans Union has a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

> This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . .." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

21. It has long been the law – since 1970 in fact – that:

> [W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent.

Federal Trade Commission, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT (July 2011), at 67.[1]

***After Being Repeatedly and Inexplicably Denied Housing, Plaintiff Discovers that Trans Union Reported Inaccurate and Derogatory Information About Him***

22. On or around October 23, 2020 Plaintiff applied for a rental property at 160 East Illinois Street, Unit 2207, Chicago, Illinois, through a company called Zumper.

23. As part of the application, Zumper shared information from a Trans Union credit report with the property agent, Prashant Shukla.

24. Shortly after Mr. Shukla received the information that Trans Union published about Plaintiff, Plaintiff received an email from DocuSign informing him that "Zumper Support voided 2020 Lease for 160 East Illinois Street 2207."

25. Plaintiff was not informed of the reason why the lease associated with his application had been voided.

26. Plaintiff later obtained housing at 400 E. South Water Street in Chicago, Illinois ("Lakeshore East"), where he lived for approximately 3.5 years.

27. During that lease, in September of 2022, Plaintiff received an email from his landlord regarding a company named "Esusu." The email informed

[1] Available at https://www.ftc.gov/sites/default/files/documents/reports/40–years–experience–fair–credit–reporting–act–ftc–staff–report–summary–interpretations/110720fcrareport.pdf.

Plaintiff that Lakeshore had "partnered with Esusu to help you build your credit through your monthly on-line rent payments."

28. Plaintiff did not sign any agreement regarding Esusu. As Lakeshore explained in its email to Plaintiff, it "enrolled" Plaintiff with Esusu automatically.

> The best part of this partnership is that you don't need to do anything to access the benefits. You will be automatically enrolled in this FREE amenity and Esusu will only report your on-time rental payments. Again, we have partnered with Esusu, because we believe you deserve credit for the rent you are already paying.

29. Near the expiration of that lease, Lakeshore East employee Chelsea Robbins informed Plaintiff that it was refusing to renew his lease.

30. Plaintiff was shocked to be told this information, because he had excellent credit and had made every rent payment in a timely manner.

31. On June 17, 2024, Plaintiff applied to rent the property located at 7770 Sandy Ridge Drive, Building 18, Unit 131, Reunion, Florida (the "Reunion Property").

32. Plaintiff's Reunion Property application was facilitated through Florida real estate agent Michelle Fernandez with P4L Realty, LLC, using a Trans Union product called RentSpree.

33. Following instructions from Michelle Fernandez, Plaintiff completed the information requested by RentSpree, which resulted in Trans Union creating a "background check" consumer report regarding Plaintiff (the "June 2024 Background Check").

34. Trans Union published the June 2024 Background Check to Michelle Fernandez.

35. The June 2024 Background Check contained inaccurate and derogatory information regarding Plaintiff. Specifically, in the June 2024 Background Check, Trans Union reported that Plaintiff had a "Criminal Identity" entry on his report:




36. The information was inaccurate. Plaintiff does not have a criminal history. On the contrary, Plaintiff is an upstanding citizen. He is a practicing attorney who is licensed (and in good standing) in multiple jurisdictions.

37. Plaintiff was shocked and humiliated when he saw Trans Union accusing him of being a criminal.

38. Upon information and belief, the information being reported by Trans Union under "Criminal Identity" was a simple speeding ticket that Plaintiff received in Ohio in 2018 (the "Speeding Ticket").

39. The Speeding Ticket was issued pursuant to Chapter 5537-2 of the Ohio Administrative Code, Rule 5537.2.03A, which provides that:

> No person shall operate a motor vehicle upon the turnpike at a speed which is greater than the posted speed limit or greater than is reasonable or proper, having due regard for the weather, traffic, surface, and any other conditions, and no person shall operate any motor vehicle upon the turnpike at a greater speed than will permit the operator to bring it to a stop within the assured clear distance ahead. In no event shall any motor vehicle be driven in excess of the speed limits prescribed by state law or in excess of posted speed limits.
>
> OHIO ADMIN. CODE 5537-2-03 (2013).

40. The Speeding Ticket was not a criminal ticket.

41. There was no mandatory hearing for the Speeding Ticket.

42. The Fulton County, Ohio court records search lists the case type as "Traffic":



1 Western District - **TRD1802837**

**Concerning:** MOORE, BRENDEN M
**D.B.A./A.K.A.:**

**Filed:** 08/13/2018
**Case Type:** Traffic
**Viol./Cause:** 87/70 speed

Case Docket

43. Plaintiff paid the $47 fine associated with the Speeding Ticket, along with the $93 in court costs, in a timely manner.

44. Upon information and belief, Trans Union has falsely reported to third parties on multiple occasions that Plaintiff has one or more "criminal" matters.

45. Upon information and belief, Plaintiff has been denied housing several times due to Trans Union's false reporting.

***Plaintiff Suffered Actual Harm***

46. Trans Union's defamatory reporting has caused Plaintiff harm and significant distress for several years.

47. As a result of Trans Union's inaccurate credit reporting, Plaintiff has suffered damages, including, but not limited to:

a. Harm to Plaintiff's housing opportunities;

b. Denial of housing;

c. Fear of being denied housing;

d. Apprehension in applying for housing;

e. Monies and time lost on application fees for housing;

f. Loss of privacy;

g. Harm to reputation;

h. Stress associated with attempting to resolve this matter; and

i. Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life.

***Defendant's Conduct was Willful***

48. The FCRA allows for a remedy for a "willful" violation. A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007). A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

49. Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

50. As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years. The language of § 1681e(b) has not changed. The FCRA's caution of Trans Union's "grave responsibilities" to ensure accuracy has not changed.

51. The CFPB has maintained a Consumer Complaint database since 2017. It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the Trans Union, and/or to other government agencies, attorneys, or non-profit organizations.

52. Trans Union regularly receives unredacted consumer dispute details from this database.

53. Since the database began accepting complaints, the CFPB has sent millions of consumer credit reporting complaints to Trans Union.

54. Further, over 1.5 million of the CFPB complaints about Trans Union were based largely on Trans Union reporting inaccurate information on consumer reports.

55. Just in the last 12 months alone, Trans Union has been sued by consumers alleging its violation of the FCRA over 2,000 times. Most of these alleged that Trans Union violated § 1681e(b) by failing to maintain reasonable procedures to assure maximum possible accuracy regarding the information it includes on consumer reports. This complaint history has been true for nearly every year over the last decade.

56. While the thousands of consumer complaints and millions of consumer disputes alone would have put Trans Union on notice of the failures of its dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed Trans Union on notice that it may not merely "parrot" what its sources tell it.

57. CRAs—including Trans Union—have had actual notice from numerous other courts that their blind ACDV "parroting" was unlawful. *See, e.g.*, *Centuori v. Experian Info. Sols., Inc.*, 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'"); *Schweitzer v. Equifax Info. Sols., LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax*

*Info. Sols., LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does not act reasonably under the FCRA by deferring entirely to another source of information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073-74 (D. Or. 2011)("[Equifax] instead utilized an automated dispute system to verify the accuracy of plaintiffs' account. Many courts, including this one, have concluded that when a CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation.").

58. Trans Union has long had specific notice of these requirements. The seminal Circuit Court decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer was a Trans Union case. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997). Defendants' notice was so substantial that another court instructed the jury in a § 1681i(a) trial:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed . . . that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05-cv-888 (E.D. Va. Aug. 27, 2007).

59. Trans Union has also been repeatedly criticized by Federal and state regulators, and consumer groups for its refusal or failure to conduct substantive reinvestigations.

60. In 2015, a large group of state Attorneys General forced a consent order from major CRAs, including Trans Union, by which they were required to develop procedures necessary to comply with the FCRA.[2] The AG Settlement required, amongst many changes and mandates, that Trans Union comply with § 1681e(b).

61. The AG Settlement also required Trans Union, along with other CRAs, to conduct significant research and data gathering—even creating a "working group" to address these issues, and to develop special procedures to handle disputes as in this case. Notwithstanding these requirements, Trans Union did not meaningfully comply with the AG Settlement in these regards.

62. Despite the notice and judicial, regulatory, and public interest criticism, Trans Union has refused to improve its report creation process because it believes it would cost too much money to do so.

63. Trans Union's procedures imposed on Plaintiff an unjustifiable and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

## CLAIMS FOR RELIEF

## COUNT I:

---

[2] *Available at* https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.

**VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681e(b)**

64. Plaintiff realleges and incorporates the allegations set forth in paragraphs 1-63.

65. Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and credit files it published and maintained concerning Plaintiff when it reported "criminal" information on Plaintiff's reports.

66. As a result of Trans Union's violations of 15 U.S.C. §1681e(b) Plaintiff suffered actual damages, including but not limited to: costs associated with disputing the inaccurate information, loss of housing opportunities, harm to reputation, loss of privacy, mental anguish, stress, aggravation, and other related impairments to the enjoyment of life.

67. Trans Union furnished multiple consumer reports to third parties containing the inaccurate information.

68. The violations by Trans Union were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Trans Union was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

69. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Trans Union in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## DEMAND FOR RELIEF

Plaintiff therefore respectfully requests that this Court:

(1) Award Plaintiff actual and punitive damages for violations of the FCRA by Trans Union;

(2) Award Plaintiff attorney's fees and costs under the FCRA;

(3) Award Plaintiff pre-judgment and post-judgment interest at the legal rate; and

(4) Award other relief as the Court deems appropriate.

**TRIAL BY JURY IS DEMANDED.**

**BRENDEN MOORE**

By:

/s/ Craig C. Marchiando
Craig C. Marchiando, Florida Bar No. 1010769
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
Tel. – (757) 930-3660
Fax – (757) 930-3662
Email: craig@clalegal.com

*Counsel for Plaintiff*